UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Gregory Arena, | : | Case No. 5:07CV0766 |
| | : | |
| Plaintiff | : | Judge Kathleen O'Malley |
| | : | |
| v. | : | Magistrate Judge David S. Perelman |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND RECOMMENDED** |
| | : | **DECISION** |
| Defendant | : | |

Before addressing the merits of this action, brought under 42 U.S.C. §§405(g) and 1983(c)(3) seeking judicial review of the defendant's final determination denying the plaintiff's claims for disability insurance benefits (DIB), 42 U.S.C. §§416(i), 423, and supplemental security income (SSI), 42 U.S.C. §1831 et seq., this Court is constrained to offer an editorial comment which, as will appear hereinafter, is germane to this action.

This Court has been reviewing actions of this nature as a judicial officer for over twenty-eight years, and for many years before that as a law clerk to a district judge of this court.

For almost that entire time the records which this Court reviewed most often contained testimony from a physician (initially designated as a medical advisor and more recently as a medical expert) reviewing the claimant's medical history, usually opining as to the reasonableness of the claimant's subjective complaints measured against the objective medical evidence and/or offering his/her opinion as to the claimant's residual functional capacity in light of the objective medical evidence.

Less often, a vocational expert would also be called, and that witness would be asked to testify as to whether there was substantial gainful employment available to an individual described in a hypothetical question, that individual generally corresponding to the claimant's personal/vocational profile and possessing a residual functional capacity as testified to by the medical advisor/medical expert, and if so what the nature of that employment would be.

However, for about the last year many of the records do not contain any testimony from a medical expert. Instead, what this Court is encountering is that the Administrative Law Judge (ALJ), whose decision upon <u>de</u> <u>novo</u> review represents the defendant's final determination, takes it upon himself/herself to interpret the significance of the (often complex) objective medical evidence in the (often hundreds of pages) record, and draw his/her own conclusions as to the reasonableness of the claimant's subjective complaints and/or the claimant's residual functional capacity. That is often accompanied by the ALJ postulating a hypothetical question to a vocational expert reflecting a residual functional capacity commensurate with that which appears in the ALJ's decision.

In this Court's opinion this approach takes the ALJ beyond the realm of trier/finder of the facts, which is the ALJ's proper function, and puts the ALJ into the role of exercising a "medical expertise" which the law does not recognize that he or she possesses. As a practical matter, after almost a half century of reviewing claimant's medical records and testimony of physicians, who possess the qualifications to interpret that evidence, this Court probably has the same (if not a greater) level of "medical expertise" as most ALJs. Nevertheless, in reviewing the record in one of these actions it would be improper for this Court to base a determination as to whether the defendant's final determination is supported by substantial evidence by drawing upon that

background, and this Court does the utmost to refrain from doing so.

Just as it would be improper for this Court to exercise independent "medical expertise," it is equally improper for an ALJ to do so. This being so, this Court has regularly been recommending reversal of the defendant's final determination in cases in which the ALJ's decision reflects a determination resting upon the ALJ's interpretation of the medical evidence, unless it is absolutely crystal clear that the medical evidence provides no basis for the claimant's alleged disability, and this Court will continue to do so.

In this Court's opinion, this is such a case.

Before reaching the substance of this appeal there is a preliminary matter which must be addressed.

The applications which underlie this proceeding were filed on January 21, 2004, alleging disability as of March 23, 2002. These, however, were not the first such applications filed by the plaintiff. He had previously applied for DIB and SSI on July 22, 2003, and these claims terminated with denial at the state agency level on November 14, 2003.

At the outset of his decision in this case the ALJ stated:

> The record establishes that the claimant filed prior applications on July 22, 2003 which were denied on November 13, 2003 and not appealed thereafter. The undersigned finds no persuasive basis for reopening the prior claims. Therefore, the earliest onset date under consideration in this decision is November 14, 2003 (cf. 20 C.F.R. 409.988, et seq.; and 416.1488, et seq.).

The problem with this is that the very regulations cited by the ALJ demonstrate that the plaintiff was not required to present a "persuasive basis" for reopening. Both regulations cited by the ALJ provide, in pertinent part, that "A determination, revised determination, decision or reversed decision may be reopened (a) within 12 months of the date of the notice of the initial determination

3

for any reason."  The current applications having been filed within 12 months of the prior denials the plaintiff was entitled to reopening as a matter of right.

Defendant's reliance upon the ruling in Califano v. Sanders, 430 U.S. 99 (1977) to justify the ALJ's approach is totally misplaced.  That action arose in the context of a claimant seeking reopening almost seven years after a final determination entered by the Appeals Council upon a decision of an ALJ upon de novo review.  Of critical importance to this case is the statement by the Supreme Court therein that "The opportunity to reopen final decisions...[is] afforded by the Secretary's regulations and not by the Social Security Act," id at 108.  In this case the controlling regulation clearly entitled the plaintiff to reopening.[1]

Finally reaching the substance of this action, as previously noted the applications which directly underlie this appeal were filed on January 21, 2004, alleging an onset date of March 23, 2002.  In what appears to be an accompanying Disability Report Adult[2] the questions "What are the illnesses, injuries or conditions that limit your ability to work?" and "How do your illnesses, injuries or conditions limit your ability to work?" were answered "Need knee replacement Lt. knee, possible tare [sic] rt. knee.  Bad lower back pain, Dagenerative [sic] arthritis Lt. knee" and "knees swell up, back pain, muscle spazems [sic]."

Upon denial of the plaintiff's claims on the state agency level, de novo hearing before an ALJ was requested. Evidentiary hearing, at which the plaintiff was represented by counsel, was held

---

[1] This Court is mystified by plaintiff's counsel's position regarding these successive applications.  Plaintiff's brief does not directly challenge the ALJ's erroneous failure to grant reopening.  On the other hand, after stating that "the earliest medical evidence in the record predates the Plaintiff's application and will not be discussed" plaintiff's brief launches into the plaintiff's medical history starting with May 12, 2003, which implicitly suggests that counsel considers the operative applications to be those filed in July 2003.

[2] This Court says "appears to be" for the reason that the document (Exhibit E) is neither signed nor dated, which raises the question why it was accepted by the state agency authorities.  Be that as it may, the place where it appears in the record suggests it accompanied the applications.

4

on May 10, 2006. Also testifying at that proceeding was Ms. Kathleen Reis in the capacity of vocational expert.

>   When asked by his counsel why he had stopped working in 2002 the plaintiff stated:

>   > A. I just couldn't find nothing—it was chronic pain that started it. I had three to four arthroscopics on my left knee which led to the knee replacement. My work history with dock work and everything, from my back to both knees to the bottom of my feet hurt so bad that I couldn't do an all day job. I bounced around toward the end just to try to get comfortable indifferent positions in different jobs.
>   >
>   > Q. And is that your testimony that that's what you did at the temp agency? Is that what you mean?
>   >
>   > A. Yeah and I just—after that I couldn't put in a full day at all with the pain. That's kind of like when I found out I had my disc problems in my back.
>   >
>   > Q. Okay. Did the same problems that you had then in terms of your pain in 2002, do those same problems exist now?
>   >
>   > A. I've still got chronic pain but it's been a little bit better controlled right now due to the narcotics that they give—that they have prescribed me through pain management.
>   >
>   > Q. Let's break this up then. Where—I guess what body part do you experience the most pain?
>   >
>   > A. My lower back right and left side and then it goes down the sciatic, down my leg to the bottom of my feet. And I have got a tear in my right knee, a meniscus tear right now.
>   >
>   > Q. Okay. Let's start with the low back. How often do you experience pain in your low back would you say?
>   >
>   > A. It's daily.

>   He thereafter testified:

>   > Q. Okay. In terms of your—when I first asked you about your pain level, you said the back was worse, the worst, and then the—

> A. Yeah.
>
> Q. —right knee. Is that correct?
>
> A. That's correct.
>
> Q. Tell me about your right knee pain then?
>
> A. It's towards the back of the knee and it—the meniscal tear tightens up the knee real tight and it's tender and sore towards the back of the knee.
>
> Q. And if you had to describe the level of pain in the right knee on that same pain scale, what would you—
>
> A. That can get up—
>
> Q. —[INAUDIBLE]?
>
> A. That can get up to about a seven.
>
> Q. Where is it on an average basis, though?
>
> A. On an average basis? About a five, five and a half to six.
>
> Q. And is that with or without medication?
>
> A. That's with medication.

He later testified that the pain medications he takes, which include Oxycontin three times a day and two anti-depressants, interfere with his concentration and make him drowsy, and that he had developed sleep apnea for which he uses a CPAP machine at night. He described his "bad days" as:

> Q. You mentioned earlier in your testimony of having a bad day. What did you mean by that?
>
> A. Everything rolled into one. The pain with the back and the legs is worse in the morning and with the drowsiness and the sleep apnea, that's what causes the drowsiness. It just gets aggravating. It's kind of like—how I should put it—pain and sleeplessness and—chronic pain is—it's complicated I guess I should say. It can affect your moods. It can make you edgy and aggravated.

> Q. But the symptoms that you have been describing here today, do you have those most days or do you not have those most days?
>
> A. They're most days I get them.

The format of the ALJ's decision in this case, entered September 26, 2006, differs from that this Court normally finds, which includes an "Evaluation of the Evidence" followed by "Findings," which represent the rationale of decision.  In this case the ALJ's decision contains "Findings of Fact and Conclusions of Law."  The twelve subsections thereof are headed with what this Court usually sees collected in the "Findings," but most of the twelve contain a discussion of the evidence in support of the conclusion stated at their outset.  Of most importance to decision herein are the following headings:

> 3. The claimant has the following severe impairments: status post left knee replacement (Exhibits 19F, 62 and 9F, 1); degenerative disc disease of the lumbar spine (Exhibits 19F, 34 and 23F, 1); bilateral degenerative joint disease of the knees (Exhibit 15F, 28); obstructive sleep apnea (Exhibit 17F, 1-2); and anxiety disorder (Exhibits 24F, 14F) (20 CFR 404.1520(c) and 416.920(c)).
>
> \* \* \*
>
> 5. The claimant's complaints and symptoms in accord with 20 CFR 404.1529(c) and 416.929(c) have been only partially corroborated by the objective medical evidence of record and a review of the factors in Social Security Ruling 96-7p.
>
> 6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift, carry, push or pull 10 pounds occasionally, to sit 6-8 hours in a workday, and to stand and walk 2 hours in a workday, without normal breaks.  The claimant cannot kneel, crawl, or climb ladders, ropes or scaffolds, but can occasionally climb stairs and ramps.  The claimant's mental limitations are as follows: He is restricted to simple, routine tasks, involving only superficial contact with the public or co-workers without negotiation or confrontation.
>
> 8. The claimant was born on September 10, 1958, and since his

       alleged onset date has been a younger person, currently 47 years of age (20 CFR 404.1563 and 416.963).

9. The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability in this case (20 CFR 404.1568 and 416.968).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12. The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

That decision stands as the defendant's final determination consequent to denial of review entered by the Appeals Council on March 2, 2007.

On this appeal the plaintiff advances two claims of error on the part of the ALJ, those being:

1. The ALJ did not meet his burden at Step Five of the Sequential Analysis when he relied on an incorrect hypothetical question to find that the Plaintiff was capable of work that exists in significant numbers in the national economy.

2. The ALJ failed to articulate a valid basis for not giving the opinion of the Plaintiff's treating physician controlling weight.

Taking up the second of these issues first, as was recently reiterated in Howard v. Commissioner of Social Security, 276 F.3d 235, 240 6 (6th Cir. 2002), citing to Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985), while it is often said that the opinion of a treating physician on the ultimate issue of disability is not binding, see, Le Master v. Weinberger, 533 F.2d 337 (6th Cir. 1976) that is not always the case. In King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) the court stated the controlling rule to be "Indeed, it has long been the law that substantial deference--and, if

8

the opinion is uncontradicted, complete deference--must be given to such opinions and diagnoses." See also, Colwell v. Gardner, 386 F.2d 56, 72 (6th Cir. 1967); and Walston v. Gardner, 381 F.2d 580, 585 (6th Cir. 1967).

To be entitled to significant weight the conclusory opinion of a treating physician must be supported by clinical or diagnostic findings. Kirk v. Secretary of Health and Human Services, 667F.2d 524, 538 (6th Cir. 1981). However, it is not necessary that such supporting detail be contained in the same document in which the physician's opinion is expressed. It is sufficient if that opinion is supportable by other medical evidence in the record, including clinical or diagnostic findings of other physicians. See, Garner v. Heckler, 745 F.2d 383, 391 (6th Cir. 1984).

Under date of July 10, 2006 a primary treating physician, Dr. Scott Rigby, completed a questionnaire concerning the plaintiff's physical capabilities/limitations. Therein he stated that the plaintiff could not perform any lifting or carrying by reason of "LB sciatica/chronic LBP, OA-S/P L TKR-severe ⇓ ROM."[3] The doctor further stated that the plaintiff could not engage in prolonged standing, and that although the plaintiff's impairments did not effect sitting "However, pt would need frequent breaks to alleviate chronic LBP/sciatica." In conclusion the doctor stated "Pt is not employable 2° multiple exacerbators of chronic LBP/sciatica and OA (S/P L TKR)."[4] In that report when asked to state the medical findings which supported certain of the plaintiff's restrictions Dr. Rigby referenced "MRI findings."

On April 10, 2006 the plaintiff underwent an MRI of the lumbar spine. While most of the

---

[3] While this Court believes that the reference to "LB" means low back, "LBP" means low back pain and "⇓ROM" means reduced range of motion, this Court has no idea what the other shorthand references may mean.

[4] Again, this Court does not know what the reference "OA (S/P L TKR)" may refer to.

9

findings were unremarkable,[5] the report reflects " small broad disc protrusion at L4-L5 flattening the ventral aspect of thecal sac with mild thecal sac narrowing.  There is mild to moderate facet hypertrophy with mild to moderate bilateral neural foramina narrowing."

The April 2006 MRI appears to have been the outgrowth of an office visit of March 16, 2006, in that the patient note of that visit reads in part "Worsening sciatica on the left.  This does not correlate with the MRI which was reviewed today with the patient.  Will refer back to pain management for probable repeat MRI, continued intermittent therapy.  He has failed 4 epidural steroids and may require surgery, although his back appears inoperable based on the current MRI."

It would appear that the MRI referred to in that note had been performed in March 2005.  The conclusions stated in the report of that examination were:

1. Disc space narrowing at the L3-4, L4-5 and L5-S1 levels with degeneration of all lumbar discs.

2. Multilevel mild disc bulges extending from L2-3 to L4-5 most prominently at the L4-5 level with mild narrowing of the right L4-5 neural foramen and only mild canal narrowing.

3. Mild to moderate central disc protrusion/herniation of the L5-S1 disc measuring about 3-4 mm with some disc bulging extending off to the right.  There is no significant canal stenosis.  The disc in the right paramedian position does touch the right S1 nerve root.

That MRI had been ordered by Dr. Ali Shakir, to whom the plaintiff had been referred by Dr. Rigby in July 2004 for "evaluation of his left knee pain and restricted range of motion."  Dr. Shakir's report of that evaluation states, in part, "Lumbar range of motion noted to be full," "straight leg raising noted to be negative bilaterally," and "lumbosacral spine testing is noted to be negative." This court believes that this could bear upon the plaintiff's subjective complaints.

---

[5]Minimal disc bulges were found at L2-L3, L3-L4 and L5-S1 without thecal sac impingement.

In rejecting Dr. Rigby's July 2006 assessment of the plaintiff's capabilities the ALJ took it upon himself to determine that "Dr. Rigby's own treatment notes does [sic] not corroborate a finding of these extreme limitations."  Whether those notes do or do not support the doctor's conclusions is, in this Court's opinion, a question for a medical expert, as it calls for interpretation of, not merely the weighing of, the medical evidence.

The ALJ also included as a factor negating the plaintiff's claim of disability that "In fact, the claimant has described attending Browns, Indians and Cavs sporting events, indicating a capacity for activity level contrary to what is described by his treating physician."  "In fact," what the plaintiff testified was that he has not attended any Browns games, that he has probably been two Indians games since he had his knee replacement and that he sat in "one little section for people like, you know, me where they can't bend," and that he had not been to any basketball (Cavs) games, although he had attended a couple of hockey games at the Gund Arena, where both teams play.  This Court hardly considers that minimal level of attendance at sporting events over a period of several years as inconsistent with the plaintiff's claim of disability.

Finally, there is the ALJ's reliance, in part, upon the opinion of State agency medical consultants.  Those evaluations were made in March and July of 2004, well before the bulk of the medial evidence came into the record.  This being so, this Court considers them to be worthless.

Based upon all the foregoing, this Court is of the opinion that the defendant's final determination should be reversed and the action remanded for further proceedings at which testimony would be taken from a medical expert.  It is, accordingly, recommended that such an order

be entered pursuant to the fourth sentence of 42 U.S.C. §405(g).[6]

                                                    s/DAVID S. PERELMAN
                                                    United States Magistrate Judge

DATE:   January 16, 2008

**OBJECTIONS**

      Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[6] While this Court does not consider it necessary to address the plaintiff's alternate claim of error, this Court will simply state that it was not a particularly compelling argument.